OPINION OF THE COURT.
The Vice-Chancellor.
The complainants, by their bill, claim that they as heirs of John Bogardus, are the owners in fee of an equal undivided thirtieth, of the northern and principal portion of the property in the city of New York, long known as the “ Church Farm.” This part, said to contain sixty-two acres, extended from a line about one hundred feet south of what is now Warren street, northwardly to what is now known as Christopher street, and from the Hudson river, on the west, to what is now Broadway, at its south line, and along the line of *721 Broadway, nearly to Duane street; and from thence its eastern boundary ran northwestwardly, gradually approaching the river at its northern extremity.
The bill proceeds on the ground that the corporation of Trinity Church, from 1705 to the present time, have been in the possession of this portion of the farm, as tenants in common with the complainants and their ancestors, from whom they derive their title; and that the corporation is bound to account to them for their proper share of the rents and issues received from the farm, and from sales of such portions as have been sold, and to refrain from any further leases or sales affecting the complainants title. .
The defence interposed to this claim is, that in 1705, Queen Anne granted the whole Church Farm to the corporation of Trinity Church in fee-simple; that the church then entered into possession, and has ever since been in the sole possession, exclusive of any other right, claiming it absolutely as its own property. In other words, the defendants plead an adverse possession of the lands claimed, for one hundred and twenty-five years before this suit was commenced, under a deed, conveying the lands to them in fee-simple.
The highest judicial tribunal in the state, affirming the elaborate judgment of the chancellor, has decided that the defence thus interposed is valid,.and a perfect bar to the complainants suit. (See the report of this case, on the argument of the plea before Chancellor Walworth, in 4 Paige’s Rep. 178; and in the Court for the Correction of Errors, in 15 Wendell’s Rep. 111.)
The law as to the force and effect of the plea, is thus established in the outset; and the great question before me, is presented in the simple proposition, Is the plea true inpoint of fact ? In determining the question, I am confined to the truth of the matters stated in the plea. Those alone are in issue between the parties ; and the statements in the bill, and in the answer accompanying the plea, are unimportant, except so far as they may tend to disprove or establish those contained in the plea. Before proceeding to those allegations, 1 will speak of certain facts which are admitted to be true by the form of the pleadings, and which the complainants insist have an important bearing *722 upon the defence. Thus, it is admitted that the “ Dominie’s Bowery,” constituting the part of the Church Farm before described, was, on the 27th of March, 1667, granted and confirmed in fee, by Governor Nicolls, to the children and heirs of Anneke Jans, the widow of Dominie Everardus Bogardus, which confirmation recited a grant of the same land by the Dutch Governor, Van Twiller, to Anneke Jans and her husband, Roelofe Jansen, in 1636, and a patent or ground brief to Anneke Jans, from Governor Stuyvesant, in 1654. It is in like manner admitted, that Anna or Anneke Jans Bogardus had eight children, who were either living at her death or had died leaving issue ; and that, by the subsequent deaths of two of her children without issue, Cornelius Bogardus, one of her sons, became seised of one-sixth of the Dominie's Bowery; that his right descended, on his death in 1707, to his eldest son, Cornelius ; from the latter to his eldest son, Cornelius, in 1759 ; and from the latter, on his death, in 1794, to his five children, of whom John Bogardus, the complainants father, was one.
It is also admitted, that on the 9th of March, 1670-71, some of the heirs of Anneke Jans, executed a conveyance in fee of the Dominie’s Bowery, described as containing about sixty-two acres, to Colonel Francis Lovelace, who was then the governor of the province of New York. This transfer purports to have been made by William Bogardus, for himself and his brothers, Jan and Jonas, and by two of the sons-in-law of Anneke Jans, one in the right of his wife, and as attorney of another son-in-law, whose wife was deceased, and the other in right of his wife and by assignment of one of the sons, Peter Bogardus. It does not appear to have been executed by or for Cornelius Bogardus, the son of Anneke Jans; but it describes the whole farm or bowery, and speaks of it as the farm or bowery of the grantors.
This deed or transport appears to have been recorded, but at what time is not shown, otherwise than that it is found in a Book of Transports begun in the year 1665.
Several other matters charged in the bill, which are to be taken as true on this hearing, will be more conveniently men *723 tioned in connection with the various points upon which they are supposed to have an influence.
The plea, formally stated, contains the three following heads or propositions, viz:
First. That Queen Anne, being in the possession and occupation of the tract known by the name of the Duke’s Farm, King’s Farm, or Queen’s Farm, referred to in the bill, and of which the Dominie’s Bowery is parcel, and being in the receipt of the rents and profits thereof to her own sole and separate use and benefit; did by letters patent, under the great seal of the province, dated November 23d, 1705, give, grant, ratify, and confirm to the corporation of Trinity Church, in fee simple, the farm before mentioned, reserving a yearly rent of three shillings, New York currency, in lieu of all other services, dues, and demands.
Second. That the corporation of Trinity Church, on the day of the date of the letters patent, entered upon and became seised in their demesne as of fee, of and in the farm, including the Dominie’s Bowery, claiming, by force of the letters patent, and not otherwise, to be of right sole and exclusive owners of the same and of every part thereof in fee simple.
Third. That by themselves and those claiming under them they have, from the day of such entry, continually, down to the present time, been in the uninterrupted, sole, exclusive, and actual seisin and possession of the premises called the Dominie’s Bowery, and of every part thereof, claiming the same as sole and exclusive owners in fee; and have been in the sole and exclusive receipt and enjoyment of the rents, issues and profits, to their own sole and separate use and benefit, without having paid over or accounted for any part of the same, to the complainants, or to any person under whom they claim, and without at any time having held or possessed any part of the premises, or any rents or profits therefrom, or any estate or interest therein, in common and undivided with, or as trustee of the complainants, or of any person under whom they claim to derive title, and without ever having admitted or acknowledged, that the complainants, or any person under whom they claim, *724 were entitled to any payment or account, or had any estate, share or interest, in common or undivided, in the premises in controversy.
These three fundamental propositions will be treated separately, and in their order.
*' FIRST. The sole possession of Queen Anne, and her grant to the defendants corporation on the 23d day of November, 1705.
It is to be observed, that the plea does not assert that the queen was the owner of the farm granted, or that she had any estate or title whatever. The averment relates exclusively to her possession and its character.
These are facts of which written evidence can scarcely be expected. Such testimony rarely exists in any case. And after the lapse of more than one hundred and forty years, not only is the testimony of living witnesses to such facts utterly impossible, but even oral tradition respecting them, has almost invariably faded away in the dim shadows of the past.
In their search for truth, the courts are required, in instances like the one under consideration, to receive evidence which would be inadmissible if offered respecting events occurring within the memory of living witnesses. Thus, the statements of historians of established merit, the recitals in public records, in statutes and legislative journals, the proceedings in courts of justice, and their averments and results, and the depositions of witnesses in suits or in legal controversies, are from necessity, received as evidence of facts to which they relate, but always with great caution, and with due allowance for its imperfections and its capability of misleading ; and restricted, as to historical evidence, to facts of a public and general nature. (See on this subject, Bullen v. Michel, 4 Dow’s Parl. Cases, 297, 323, 324.)
There is the more reason for relying upon such evidence, because, on a question of the possession of land and of the character of the claim, the acts of the claimant are competent to prove the occupation; and when he is shown to be in possession1, his declarations as to the manner of his holding are always admissible, either against him to establish a tenancy, or in his *725 favor to lay the foundation of an adverse possession. For a rule of evidence so familiar in actions affecting the title to lands, it is unnecessary to refer to authorities.
I. To proceed to the possession of the farm, at the date of the letters patent to Trinity Church.
The bill is silent as to the possession of the Dominie’s Bowery, as well as the whole Duke’s Farm, prior to 1705. It contains no allegation that Governor Lovelace, the Duke of York as proprietor of the province, or any other person, ever entered under the deed of transport to Governor Lovelace; except its charge as to the entry of the corporation of Trinity Church, which will be noted in another place. If any legal presumption as to the possession is to be deduced from the title having once been in Anneke Jans, and from the cautious statement in the bill as to the execution and effect of the deed of transport executed by a portion of her children, it is simply this, that on her death her children succeeded to the possession in point of law, and on the execution of the transport, Governor Lovelace succeeded to that possession, at least to the extent of the interests of those whose title it assumed to grant. And as it assumed to convey the whole farm, the presumption would necessarily be that he took possession of the whole, claiming it under the deed, unless he knew, (and of this there is neither proof nor probability,) that there was one heir of Anneke Jans who was not named in the instrument.
In Jackson, ex dem. Preston v. Smith, (13 Johns. 406,) where one purchased a lot of land, and received a deed for the whole lot, in which the grantor was described as heir of the patentee, and entered into possession under the deed, and it afterwards appeared that the grantor was only one of nine heirs of the patentee, and owned only one ninth of the lot as tenant in common with his co-heirs; it was decided that the purchaser must be deemed to have entered under his deed as sole owner in fee of the whole lot, and that his possession was adverse to the rightful owners, and was not a possession in common with them.
A resort to legal inferences upon the admitted facts in the bill, *726 therefore, places Governor Lovelace in possession of this property, claiming the' whole title in fee under a deed, as early as 1671. The subsequent transmission of his right aiid possession to the Duke of York as proprietor, was so perfectly natural and obvious, that the counsel on both sides concurred in assuming it as unquestionable. Governor Lovelace’s administration termináted on the surrender of New York to the Dutch, in August) 1673, and his name has never appeared in connection with the farm, from that day to the present. His title and possession, (if he acquired either,) were doubtless taken in his official capacity, and vested in the Duke of York. They continued in the latter, as duke, and then as King James II., till the English revolution, by which he was dethroned and exiled, and then with other crown and proprietary lands, were transmitted to William and Mary, and on the death of William III., to Orneen Anne.
Thus, setting out with the title of Anneke Jans, and the transport to Governor Lovelace, we have the legal presumption, that the Dominie’s Bowery was possessed from 1671 to 1705 by the Duke of York, and the sovereigns of England continuously, under a claim of title to the whole of it by deed, exclusive of any other right; and that at the date of the letters patent, Orneen Anne was in possession and occupation, and receiving the rents to her own sole use and benefit.
Next, dismissing entirely all inferences in favor of the queen’s exclusive possession, arising from the transport and historical proofs before mentioned, how does this question stand upon the evidence at large 1
It is proved that Governor Andross, who arrived in the province in October, 1674, leased, or assumed to lease, the Duke’s Farm, to Dirck Seekers, or Seckners, for twenty years. This is shown by the original minutes of a trial in the supreme court of the colony, in October, 1760, in a suit in ejectment, relating to the Church Farm, brought against the corporation of Trinity Church, by Cornelius Brower and others. The record of the judgment in that suit is also produced. The minutes of the trial, show that the respective parties read in evidence on that occasion, very much the same documentary testimony as the *727 parties in this suit presented eighty-five years afterwards. Among the documents then read in evidence by the church, was an original lease from Governor Ándross to Seekers, as before mentioned, which, in the minutes, is stated to bear date March 25,1667, or 1677. The third figure is so illegible that it is read with difficulty, but it looks more like six than seven. It was manifestly intended to be entered as 1.677, for Col. Nicolls was governor in 1667, and Governor Andross was commissioned in June, 1674. The original lease is shown to be lost, and secondary evidence is therefore admissible.
In connection with the minutes of the trial, the defendants produce two affidavits, one of Jacob Kooning, the other of Mary Layton, both appearing to have been sworn on the 18th day of May, 1751, before Frederic Philipse, who was then a judge of the supreme court, and whose signatures were proved by one of his lineal descendants. The purpose for vjhich these affidavits were taken is not proved. From their form and contents, it may be inferred that they were provided in reference to a forcible entry and detainer, or some similar proceeding, which became unnecessary or was dropped. Kooning, in his affidavit, deposed that he was eighty-one years of age, and had known the Church Farm, or King’s Farm, about seventy years ; that sixty-five or seventy years before the time of his deposing, Dirck Sicken, otherwise called Dirck Dey, lived in an old thatched house ora that farm, and after his death his widow possessed the farm, and then their son Tunis. He further deposed that one Joris Ryerse married the widow of Tunis, and possessed the farm, first under the government, and afterward from the English Church. Mary Layton deposed that she was eighty-four years of age, and knew the facts stated by Kooning to be true.
The question being, not as to the estate or title, but solely as to possession and the accompanying claim, the minutes of the trial and the two affidavits, appear to be good evidence to show that Governor Andross, in 1677, assumed to control the farm as the property of the government, and to demise it as such for twenty years. (4 Dow’s Cases in Parl., 323, 324, before cited.) And in a matter of so much public concern and notoriety, as the demesnes of the proprietor and of the crown, which formed the *728 subject, within a few years thereafter, of constant and hitter controversy and frequent legislation in the colonial assembly, these documents are competent to prove, at this remote period, what was the general reputation and understanding as to the possession and the claim of and in the Duke’s Farm, as well as the assertion of the claim itself. It is strongly fortified and corroborated by the historical evidence hereafter noticed.
In 1686, in the charter granted by Governor Dongan to the city of New York, the farm in question is reserved to the crown, and is described as the “ land without the gate, called the King's Farm" the Duke of York having succeeded to the throne on the 6th day of February, 1685.
This was a direct and solemn assertion of the enjoyment of the possession and the claim of the title by the government, which was unchallenged at the time, and of so public and notorious a character, that it leaves no room for doubt as to their then being well known and indisputable facts.
On the 6th of August, 1694, Governor Fletcher in the name of the king, granted the Swamp, or Fresh-water Pond, to John Evans ; and in the letters patent the lands granted are described, both in the recital and in the grant, among other bounds, as being “ adjacent to our farm commonly called and known by the name of the Duke’s Farm"
This is another solemn public act of the government, under the great seal of the province, asserting a claim to the whole title and the possession, and also asserting that the farm was known as the Duke’s Farm ; thus connecting the claim with the duke's ownership before 1685, and showing that his title had, in 1685, been so long continued and so notorious, as to have attached his name to the property.
Next we have a lease executed by Governor Fletcher, in the name of the crown, to Trinity Clmrch, for the identical farm in question, designating it as “ our farm called and known as the King's Farm,” and the location and extent of the property, were apparently so well known, that there is no description of it by metes or bounds, or otherwise than as the King’s Farm, on the Island of Manhattan, and adjacent to the city of New York. The lease is dated August 19th, 1697, was for seven years from *729 August 1st, 1698, and reserved an annual rent of sixty bushels of wheat.
Next is the act of the colonial assembly, passed ¡May 12th, 1699, “for the breaking, vacating, and annulling several extravagant grants of land made by Colonel Fletcher, the late governor of this province under his majesty.” Among such grants recited in the act, is that to John Evans, and the lands granted are described as “ adjacent to the King's Farm, for-? merly called the Du/ce’s Farm, on the Island Manhattansand Governor Fletcher’s lease to Trinity Church, in August, 1697, is also called “ an extravagant grant of the King's Farm." (1 Yan Schaack’s Colonial Laws, 31,)
This statute exhibits in the strongest light, the assumed ownership and possession of the farm in question by the Duke of York, and then by the kings of England, and the entire publicity and notoriety of such title and possession. The legislature of the colony, sitting within half a mile of the King’s Farm, could not be mistaken as to these facts, when they were making a law which was to annul the late governor’s demise of the farm, and to regulate its future tenure.
In this connection, it may be mentioned, that in 1732, the same Swamp or fresh water, which in 1694, was granted to Captain Evans, was conveyed by Governor Cosby to Anthony Rutgers, by letters patent, under the great seal of the province ; and the grant confirmed by like letters patent, December 31st, 1733. In both of these instruments, the lands are granted as “ adjacent to the farm formerly called the King’s Farm.” The act of 1699, was so far repealed by the colonial assembly, on the 1st November, 1733, as to permit this grant to Rutgers.
On the 9th of May, 1702, Lord Cornbury, then governor of the province, executed another lease of the King’s Farm to Trinity Church, conformably to the act of 1699, to continue from May 1st, 1700, so long as he should remain governor, describing it simply as the King's Farm, without any specific boundaries or location.
It was objected to this document, that it was not signed by Lord Cornbury, and that King William, in whose name it runs, tras dead prior to its execution. As to the first objection, the *730 lease is attested by the great seal of the province. The want of the governor’s signature, will be discussed in another place. As to the other, it was a maxim of the common law that the king never dies ; and it was that part of the king which literally never dies, the sovereign authority exercised by the viceroy or governor, whose functions continued, although the person clothed with the office of king had died, and another had succeeded, which granted the lease under consideration. If it were ever questionable, the crown never did question it, and it could not be collaterally impeached. A further and conclusive answer to both objections is, that the testimony is offered not to prove title, but to establish the existence of a claim of title and a possession accordingly; so that, whether voidable or even void, the lease is equally competent to show the public affirmation by the executive of the province, of the king’s possession, and his exclusive right to the farm.
Next is the counterpart of a lease of the farm from Trinity Church to George Ryrse, or Ryerse, sealed by the latter only, dated January 24, 1704, for five years from May 1st, 1704, at an annual rent of £30 currency, describing the premises as “ all her said majesty's farm, Sec.
It was objected by the complainants counsel to this lease, and to several hundred other ancient counterparts of leases executed in the same manner, that the lease executed by the corporation should be produced, and that the counterparts were only secon- • dary evidence. Without entering into the learning of the law on this question in general, it suffices to say, that, for the purpose for which all these counterparts were introduced, they were primary and competent evidence. The idea of requiring a lessor or his heirs, in order to prove a tenancy, to produce a lease which one hundred and forty years ago, he delivered to a tenant who was to hold for only five years, when his interest in its preservation would cease, and whose descendants to the fourth generation are probably in their graves, and those of the fifth scattered throughout the globe, is too preposterous for argument. The object of the testimony, is to prove a holding under the lessor. The fact that Ryerse was in possession of the King’s Farm, about the date of the lease, is unquestionable; *731 and his parol declarations would be competent to prove the manner of his holding. Is not his declaration in writing, under seal, infinitely better and stronger evidence 1
Thus, the counterpart executed by Ryerse, in 1704, when produced by the corporation, (which is the proper custody,) is evidence that the latter assumed to exercise owership over the land, and reserved the rent to be paid to the corporation exclusively. It is a sealed admission by Ryerse, concluding him as to their right; and produced by the corporation, concludes them as to the existence of the demise. And collaterally, it establishes their claim of title; and their enforcing it upon the possession of the land. The counterpart which Ryerse received, executed by the corporation, and not by him, if produced by the corporation, would prove nothing whatever, until they had shown, what at this day is impossible, that it had been delivered to Ryerse when it was sealed. (And see Lord Rancliffe v. Parkins, 6 Dow’s Cases in Parl. 202, per Lord Eldon.)
The letters patent to the church in 1705, speak of the farm thereby granted, as having been formerly called the Duke's Farm and the King's Farm, and as being then known as the Queen's Farm, and describe it as being in the occupation of George Ryerse, yeoman; thereby further corroborating, if it were necessary, the evidence of the possession and claim of the crown at that period.
The affidavits of Kooning and Layton, state the possession of the farm by Joris Ryerse, and his claiming, first under the government, and then under the church; evidently the same person as George Ryerse. And the identity is proved by the signature to the counterpart being Gooris or Jooris Ryers, while in the body of the instrument he is called George.
In determining the question of possession, and the assertion of title at this remote age, the historical fact that the farm in question was publicly and notoriously known as the Duke's Farm prior to 1685, as the King's Farm for the next sixteen or seventeen years, and then as the Queen's Farm until its conveyance to Trinity Church, is justly entitled to the highest consideration. That it was cultivated and occupied, is not questioned ; nor, in view of its being called a farm in 1677, and its *732 close proximity to the north bounds of the then infant but growing city, can it be a matter of doubt. And such a steady, uniform designation of the farm, could not have been so publicly made for more than thirty years, unless it had been in the control and occupation of the officers of the government, claiming it for their sovereign. In Jackson v. Miller, 6 Wendell’s R. 228, the chancellor, delivering the unanimous opinion of the court for the correction of errors, held that the circumstance of a particular lot in a large tract held in common, and then subdivided into lots, being always called and known, for thirty or forty years, by the name of one of the joint owners, furnished a just inference that there had been a partition of the tract, and that such lot had fallen to the share of the person whose name it bore, there being no evidence of any claim to hold in common for fifty years before the trial.
Again, in Governor Montgomerie’s great charter to the city of New York, in 1730, Governor Dongan’s charter is recited in hcec verba / and in the thirty-seventh section, repeating various grants to the city, the exception is again made, as it was in 1686, of “ the lands called the King's Farm." This charter Was confirmed by an act of the colonial assembly, passed October 14th, 1732.
In this case there does not appear to be a particle of proof, or a circumstance on which to found an inference, that the complainants ancestor, the first Cornelius Bogardus, was ever in possession of the Dominie’s Bowery, or ever asserted a right to it; or that his right or claim was ever recognized by any person, in possession or claiming the possession, from 1671 to the date of the grant to Trinity Church.
So far, therefore, it is conclusively established that when the farm was granted to Trinity Church, the Queen was in the possession and occupation of the Duke’s or Queen’s Farm, including the Dominie’s Bowery, to her own sole and separate use and benefit. And it is clearly proved, also, that the crown of England claimed to own the farm in fee, solely and exclusively, and not as tenant in common with any person or persons. All the transactions of the government officers concerning it, *733 Show an assertion of title and absolute dominion Over the whole property.
I have been thus minute on the first branch of the defence made by the plea, because the complainants strongest point was made on the assertion that Queen Anne held the farm as tenant in common with Cornelius Bogardus, and that the defendants, under the Queen’s grant, entered and held in the same manner.
Now, if it had been proved that the Queen’s possession was as tenant in common, the' case cited from 13 Johns. 406, shows that it would not establish the position that one to whom she granted the whole in fee, would also be a tenant in common and his entry made in that character ; while it is indisputable that if she were in possession, claiming the whole in fee, exclusive of any other right, her grantee would, as a matter of course, be deemed to have entered with a like claim, and to have continued an exclusive possession in severalty. In other words, if the complainants fail to show that the possession of the crown was that of one holding as a tenant in common, there is no shadow of pretence for alleging that the possession of Trinity Church ever bore that character.
The importance of the complainants effort on this part of the case, is obvious from this, that if the corporation of Trinity Church, in 1705, entered into possession of the Queen's Farm, under a patent or deed professing to convey the whole farm,, and continued in possession, claiming the entire title for sixty years next thereafter, such possession of itself would be a complete and perfect bar against all persons, however valid their title might have been to the whole, or any part of the farm, in the year 1705. And after twenty years of such possession, no action short of a writ of right, could have availed the adverse owner; while forty years were a bar to such an account as is sought by the bill in this cause. Such was the law of England and the law of this colony at that period. It was a sound and beneficent provision, which has so far found favor with the advancing intelligence of the present age, that the time of limitation in actions to recover lands, has been shortened in this state, until it is now only twenty years, where before the Revolution, *734 sixty years were permitted to the claimant. It was a rule of law, applicable to corporations, as well as individuals; it protected the humble farms and tenements of the poor and lowly, as well as the manors and glebes of the wealthy and powerful.And it is a proper and just defence against old and dormant claims, in favor of the corporation of Trinity Church, and should be as readily conceded to them, as it would be to the complainants, were they invoking its aid against the corporation.
II. The remaining branch of the first great proposition contained in the plea, is that Queen Anne, on the 23d day of November, 1705, by letters patent, granted and conveyed the farm in question/to Trinity Church, by its then corporate name, in fee, reserving a quit-rerit of three shillings annually.
The bill of complaint sufficiently establishes this fact. It first states, that on or about the 23d of November, 1705, the corporation of Trinity Church, accepted and received the letters patent and grant of Queen Anne of that date, executed by Lord Corn-bury, then governor in chief of the province of New York, delivered to the corporation, and duly recorded in the office of the secretary of state; and that, by such letters patent, there was granted and conveyed to the corporation, that parcel of land, &c., then known by the name of the Duke’s Farm, King’s Farm, or Queen’s Farm, (describing it in brief terms.) Subsequently, the, bill charges that in and by those letters patent, the whole of the King’s Farm was granted to the corporation, including therein the shares of the heirs of Anneke Jans, who were parties to the instrument of transport in 1671. The latter clause is one of the intimations of a tenancy in common with which the bill abounds, and is not important in reference to the question immediately in hand.
The complainants, having thus made the execution of the grant from Queen Anne a part of their claim, it seems wholly needless to pursue the inquiry. The defendants, nevertheless, introduced the original letters patent, under the great seal of the province of New York, signed by the secretary, “ By His Excellency’s command,” and recorded among the patents in the secretary’s office. An objection was made to the letters patent, because they do not bear the signature of the governor, Lord Cornbury; *735 and it was urged that an agent executing a deed for his principal, must always sign as well as seal the deed. The last argument proves too much, because an agent thus executing, must sign the principal’s name, adding his own as attorney. (Townsend v. Hubbard, 4 Hill’s R. 351, in the court for the correction of errors ; and Townsend v. Corning, 23 Wend. 435, in the supreme court.) Therefore, to have made the execution of this patent valid in form as the deed of Queen Anne, according to the complainants argument, it should have been signed, “ Anne, by her governor, or attorney, Cornburyand, moreover, should have had her own seal, and not the seal of the colony, appended to it.
Laying aside the suggestion as to the seal, I venture to say, that not an instance has ever been known, among the hundreds of letters patent of various descriptions granted here while New York was a colony, or in the thousands of similar instruments executed in the name of the sovereign in England, where such a form of execution was used.
The distinction is, that these letters patent are emanations from the sovereign power, the evidences of the pleasure or bounty of the government, and are attested by the governmental authorities as public acts.
The commissions from the sovereign to the provincial governors, were never signed by the monarch in person. They were attested by the privy seal, and by the signature of the officer intrusted with its immediate custody.
Those commissions, in the colony of New York, authorized the governors to make grants of lands, which, on being passed and sealed with the great seal of the province, and entered on record, were to be good and effectual.
The sovereigns of England, never granted lands by deed. Their alienations were always of a higher character, being known in the law as alienations by matter of record. The grants wére recorded in the proper office, and the great seal was affixed to the transcript, as evidence of the grant to the public. The letters of gift or transfer were thereby made patent, or open to the world. In practice, whatever rescript or authority for letters patent emanated from the sovereign personally, whether *736 under his sign-manual or by writ of privy seal ; it formed the warrant for the officer holding the great seal, to affix the same to the letters patent, and was retained as his authority for the act.
It is very evident that grants of land in the colony, pursuing the forms used at home, were frequently, if not usually, made without the governor’s signature, and in the precise form of attestation that is used in the letters patent of 1705 to Trinity Church.
The letters patent granted in 1732, and again in 1733, by Governor Cosby to Anthony Rutgers, for the Swamp or Fresh Water, so called, at and near the Colch or Collect, were attested precisely like these, by the great seal and the deputy secretary’s signature, and were not signed by the governor.
Governor Fletcher, it appears, signed the letters patent to John Evans, in 1694, before mentioned, and the lease to the corporation of Trinity Church, as well as the charter to that church, in 1697. On the other hand, Lord Cornbury, when governor, did not, so far as it appears, attach his signature to such instruments ; nor did Governor Montgomerie, or Governor Cosby, who succeeded him. The charter of 1708, granting to the city of New York, the ferry rights between Manhattan Island and Long Island, and the lands on Long Island opposite the city, between low and high water mark, was not signed by the governor, but is attested like the grant to Trinity Church in 1705.
So of the charter granted to the city of New York by Gov. Montgomerie, on the 15th of January, 1730; which, besides the great seal, has only the approval of the attorney-general: yet it is the existing charter of the most powerful and important municipal corporation in America.
The letters patent granting the Church Farm, appear to have been recorded in the secretary’s office, in Liber No. 7 of Patents, fol. 338, &c. But the indorsement on the original, does not
state the date of the recording, nor is it proved. It however appears that the patent granting the Swamp to Evans, in 1694, was recorded in the same office, in Liber No. 6 of Patents, page 470; and, as it was annulled in 1699, and never restored, it was *737 doubtless recorded at or about its date. Hence the grant to the church, to have appeared in the next book of patents, must also have been recorded at or about the period of its execution. This is rendered the more certain, from the great number of such patents executed in Governor Fletcher’s time, as shown by the annulling act of 1699, and which, in due course, would be entered of record intermediate the grant to Evans and that to Trinity Church.
The execution of Queen Anne’s grant to the defendants, as set up in their plea, is therefore established by the proofs, as well as by the complainants own charge in the bill of complaint.
There is one further objection to the grant, founded upon the act of the colonial assembly, heretofore mentioned, passed May 12, 1699, by which it was provided that it should not be in the power of the provincial governors, to grant or demise the King’s Farm, and certain other lands, for any longer period than for their own time in the government; and declaring that such lands were for the benefit and accommodation of the governors of the province for the time being.
This act was repealed by the assembly on the 27th of Nov. 1702, and was not in force in the colony from that time to June 26, 1708, when the Queen disapproved the repealing act, and confirmed the act of 1699. 1 (1 Van Schaack’s Laws, 31, 51.) It is contended that the effect of her disapproval, was to undo all that had been done while the repealing law continued in force.
Such a rule of construction, applied to private rights, would be denounced as most tyrannical, arbitrary, and unjust. For instance, we have an act of Congress requiring a residence of five years to entitle an alien to naturalization. Suppose that Congress, at its late session, had repealed this law, and enabled aliens at once to become citizens, and an alien now arriving here, should take the necessary oaths, become a citizen, and purchase lands ; and, at the next session of Congress, the act of the late session should be repealed. Would not the doctrine that thereby all that was done under the statute while it existed, was avoided, be denounced as monstrous and absurd?
The principle is the same, in respect of the repealing act of *738 1702. Rights acquired under it, prior to the Queen’s disapproval, were as valid and effectual as if the act of 1699 had never been enacted.
It is further contended, that the repealing act of 1702, was of no force until it received the Queen’s assent, and it never did receive her sanction. If the argument held good, it would be suicidal to the complainants, because the Queen never approved the annulling act of 1699, till June 26, 1708; and thus the latter act was not in force, when the letters patent were granted. But this was not the effect of the colonial legislation. Such statutes were valid and in force, until they were disapproved by the sovereign. The governor’s approval was sufficient in the •first instance.
In truth, the whole discussion, as to the force and validity of the letters patent, is foreign to the only question in issue ; and the defence is just as perfect, if the patent were defective in form and in its execution, or were contrary to the positive enactments of an existing statute ; as if its validity in all these respects were conceded.
. To found the defence of adverse enjoyment under a claim of •title, it is wholly immaterial whether the claim be made under a deed valid in form, or under one wanting in all the essentials of a proper conveyance. Indeed, an actual occupancy by one claiming the title, will ripen into a perfect right in twenty years, although he has no written evidence of title whatever.
Nor does the circumstance that the title claimed is void, or that it was taken or commenced in fraud of the law, detract from the force of an adverse possession maintained under it. In "the case of Harpending v. The Reformed Protestant Dutch Church, the immense property in dispute, was adjudged to the Church by the Supreme Court of the United States, on a naked .plea of an actual occupancy for forty years, claiming the title adversely to the complainants, without setting up any written title or claim. And although it appeared that the Dutch Church originally took the property and entered upon it under a will, at a 'time when they had no right to take property by devise, and when they were prohibited by law from so doing, and it was contended that such an entry in defiance of the law, was *739 fraudulent, and could never become the basis of an adverse possession, nor prevent the entry of the true owner; yet that high tribunal declared that those facts did not impair the defence of the Dutch Church, and that their plea was a perfect bar to all the world. (16 Peters’s Rep. 455.) A precisely similar decision, was made by the highest court in this state, in Humbert v. Trinity Church, (24 Wend. 587.)
So in this case, the defence arising from the possession and claim of title is equally effectual, if proved, as if there were no question, or even criticism, on the force and validity of the letters patent of 1705. Whether they were good against the crown, or were void, they constituted a written color of title, under which the parties entered and claimed to hold the land.
All these principles as to adverse possession, were decided by the court for the correction of errors, in Clapp v. Bromagham, (9 Cowen, 530.) It was there held that possession under claim of title, with or without a valid deed, is adverse; and though the possessor’s title be clearly defective, yet the true owner must sue within twenty years, or his entry is barred. And that the entry of one of several heirs, claiming the whole and denying possession to his co-heirs, and selling the land to a stranger, constitutes a possession adverse to the co-heirs, and, being continued twenty years, bars their right of entry. (See also Jackson, ex dem. Vanderlyn v. Newton, 18 Johns. Rep. 355; and La Frambois v. Jackson, ex dem. Smith, 8 Cowen, 589.)
SECOND. The second head or proposition contained in the defendant’s plea, is that the corporation of Trinity Church, on the day of the date of the letters patent, entered upon and became seised in their demesne as of fee in the Q.ueen’s Farm ; claiming, by force of the letters patent, and not otherwise, to be of right sole and exclusive owners of the whole farm in fee-simple.
The bill charges that the church entered upon the whole farm in 1705, under the letters patent, and the instrument of transport executed by the heirs of Anneke Jans in 1671. And the complainants seek to connect the transport with the entry) by a letter from a committee of Trinity Church, in 1785, to the,. *740 claimants of apparently, another property, called Dominie’s Hook.
As to this letter, I cannot add any thing to the conclusive remarks of Chancellor Walworth, when this plea was before him in 1833. The letter contains no statement or admission that the church ever claimed under the transport; and if the admission had been direct and positive, it could have no influence upon the defence. The church had for eighty years possessed the property under the grant of Queen Anne, which conveyed the whole, and they had claimed the whole. The title thus acquired could not be shaken or impaired by the fact that Queen Anne, when she granted the whole, really owned but five undivided sixth parts; much less by an admission of the fact made eighty years subsequent to her grant. The letter was simply intended to point out to the claimants, what it was supposed they did not know, that their ancestors had conveyed in 1671, the title which they set up in 1785. And it does not appear that the committee who wrote it were aware that Annelce Jans left any heirs, save those by whom the transport appeared to have been executed.
The implied admission which the complainants attempt to derive from the letter of 1785, is far from being as strong or legitimate as that which might be supposed to arise from the circumstance of taking a deed from the real owner. Yet the supreme court decided against such an inference in Jackson v. Newton, (18 Johns. 355.)
The fact that the corporation of Trinity Church entered in 1705, and claimed, as is alleged in the plea, is abundantly proved. The lease to Ryerse, in 1704, shows that they did not then claim as owners or in fee. Every act and claim of theirs, after 1705, are those of an absolute owner of the whole estate. The rent reserved in Governor Cornbury’s lease, was no longer paid. No rents were ever after paid, save the quit-rent reserved in the letters patent. The church leased the land at pleasure, from that period onward to the present time, for long terms, generally for 21 years, and ranging to 99 years, and in process of time, sold large portions of it in fee.
The time of their entry is fixed by the bill, as cotemporary *741 with the patent from the queen. To what else can this entry be attributed than that grant 1 They had no other deed or muniment of title. They received a deed in fee, they entered, and they claimed in fee. Can there possibly be a doubt that they entered under such deed ? It does not appear that they had ever heard of the deed of transport. The inferences are ail adverse to such a supposition. The government is never to be presumed to grant the same land twice. (Jackson, ex dem. Stoutenburgh v. Murray, 7 Johns. R. 5.) The farm had been known as the Duke’s and the King’s, for more than thirty years, without the assertion of a hostile right or claim. And no person receiving a title from the sovereign power of the state, either at that day or this, would think of inquiring into the source of the title, or of investigating it, as in the instance of conveyances by private individuals.
But there is another, and certainly, in view of all the facts, a very strange argument, urged against referring the entry in 1705, to the letters patent, and according to it, the character of a claim of title adverse to any other right. It is, that the corporation of Trinity Church continued in possession as tenants to the crown, till the American Revolution; and from thence to the present time, have been the tenants of the people of this state. This position, it is to be observed, is directly in the teeth of the bill of complaint, which alleges positively that the church entered into the farm under the transport and the letters patent, and thereby became and were seised as tenants in fee, &c. And it is directly in contravention of the letters patent, as stated in the bill, and as proved. Much of the argument, it is true, was based upon the alleged invalidity of the grant of Queen Anne, of which I have already said quite enough. But it was urged with apparent gravity, aside from that point. Now, I have been unable to discover a particle of evidence, in support of the idea, that the church continued in possession of the farm as a tenant, holding over after the expiration of Lord Cornbury’s lease ; while the mass of evidence introduced in support of the next head of the plea, is uniform and conclusive to the contrary, in every instance. As to the permission of the government to their continued occupancy, coupled with the oft-asserted *742 illegality and nullity of the grant, in 1705, there is much testimony rebutting both positions, and hone in favor of any such permission. I should have alluded before, to the extended, but vague and undefined allusions to the conduct of Lord Cornbury in reference to Trinity Church, and the singular reasons imagined for his not signing the letters patent. All of these, as well as the assertion of illegality, may be further put to rest by a recurrence to the testimony, and to historical facts.
Trinity Church, as a part of the religious establishment connected with the state at home, was, from its institution, favored and patronized by the government here ; and to such an extent, that prior to the Revolution, it was repeatedly the cause of great offence to other religious sects, and of many political struggles and broils in the colony. The grant of the Queen’s Farm, was in entire accordance with the uniform policy of the provincial government. It appears, by a paper laid before the clergy convened by Lord Cornbury, at . New York, in October, 1704, that he had recommended to the Queen to bestow the King’s Farm to the use and benefit of Trinity Church. In November, 1705, the grant was made, which, from its extent and notoriety, and the hostility already exhibited toward Governor Cornbury in the -province, to say nothing of the jealousy of those of other religious denominations, would be likely to reach the ears of the government in England, without much delay. If, therefore, the grant had been made without the previous assent of the Queen, or, being made without it, had been deemed extravagant and improvident, it would doubtless have been revoked within a year or two after its date.
Instead of any such proceeding, it appears by a letter from her secretary of state, Lord Bolingbroke, dated April 14, 1714, in the queen’s name, addressed to Governor Hunter, who succeeded Lord Cornbury, that the queen, on learning that the church had been prosecuted in chancery for the rents which Governors Fletcher and Cornbury had omitted to collect, and that her letters patent to the church were rendered disputable, directed that all such proceedings should cease until her further pleasure was signified. In this document, the grant of the farm to the church by Lord Cornbury is mentioned by way of recital, as having been made by virtue of the authority derived from the *743 queen, and granted under the seal of her province of New York, without any intimation of its being unwarranted or improper. No further proceedings were ever had, or directions •given as to the suit, so far as it is known.
In the thirty-fifth section of Governor Montgomerie’s charter to the city, there is an express grant and confirmation to all the inhabitants and freeholders, of all lands on Manhattan Island, to them granted and conveyed, or intended so to be, by any of the late governors of the province.
Besides this testimony, the quit rents on the letters patent, were paid in full by the church to the colonial receiver general, in 1738, in 1751, and in 1768, and to the treasurer of this state in 1786, when they were commuted ; and for one hundred and forty years, there has been no effort made or pretence set up, on behalf of the government, to subject Trinity Church to the position of tenants holding the Church Farm under the king of England, or under the people of the state.
The notion of any such tenancy having existed after 1705, is entirely unfounded.
The residue of the statement of the plea, that the corporation of Trinity Church, upon their entry in 1705, became seised of the farm, of and in their demesne as of fee, is not only asserted by the complainants in their bill, but is a direct and necessary •consequence of their entry, claiming the whole title in fee by force of the letters patent. (Co. Litt, 15, a; Ricard v. Williams, 7 Wheaton, 59 ; The People v. Leonard, 11 Johns. 504.)
THIRD. The remaining proposition constituting the defendants plea, is that by themselves and those claiming under them, they have, from the time of their entry under the letters patent into the dueen’s Farm, on the 23d of November, 1705, continually down to the year 1831, when their plea was filed, been in the, uninterrupted, sole, exclusive, and actual seisin and possession of the premises called the Dominie’s Bowery, and of every part thereof, claiming the same as sole and exclusive owners in fee ; and have been in the sole and exclusive receipt and enjoyment of the rents, issues, and profits, to their own sole and separate use and benefit, without having paid over or. ae *744 counted for any part of the same to the complainants, or to any person under whom they claim, and without at any time having held or possessed any part of the premises, or any rents or profits therefrom, or any estate or interest therein, in common and undivided with, or as trustee of the complainants, or of any person under whom they claim to derive title, and without ever having admitted or acknowledged that the complainants, or any person under whom they claim, were entitled to any payment or account, or had any estate, share, or interest, in common or undivided, in the premises in controversy.
The testimony introduced by the defendants in support of this branch of their defence, was most full, complete, and overwhelming. Its historical interest, and the patient, minute, and almost Herculean labor of its preparation and development, richly merit a far more extended notice than my pressing duty to other suitors in this court, will enable me to bestow upon the subject. My notice of the testimony will, therefore, be brief and general.
But first, the fact that the church was in the actual possession of the property from 1705 to the present time, (with a solitary exception after the Revolutionary War, which will be discussed hereafter,) is conceded by the complainants throughout their bill. They found their claim for an account upon this allegation, together with the assertion that the church held as tenant in common with their ancestors respectively.
The issue made by the plea, therefore, is mainly upon the character of the possession thus maintained by the church. Was it a possession claiming the whole title, exclusive of any other right; or was the church, for more than a century, occupying the land, and receiving the rents, for the use and benefit of the successive Cornelius Bogarduses, and the heirs of the last of the name, as well as for the church’s own benefit ?
It is a rule of evidence, founded on the experience of human affairs, that when a state of things is once established by proof, the law presumes that such state of things continues to exist till the contrary is shown, or till a different presumption is raised from the nature of the subject in question. (1 Gireenleaf’s Law of Evid. § 41.)
*745 Starting with the conceded fact, that the church took possession of this farm in 1705, claiming it as owner under a grant of the whole from the crown, which neither mentioned nor alluded to the right of any person whatsoever; and following it with the ascertained fact, that for eighty years there was no interruption of its possession ; it must be obvious to the plainest common sense, that strong and cogent proof is requisite to show that during all this long period the church held merely as a tenant in common.
Instead of proof of this character, there is nothing of the kind presented on the part of the complainants ; while a continued series of acts of ownership, extending through the whole period, and utterly inconsistent with any recognition of any claim, interest, or right in any person other than the church, is proved on the part of the defendants.
First. The historical evidence of the claim of ownership on the part of the Corporation of Trinity Church, exclusive of any other right.
The most ancient map of the city which I have met with, exhibiting “ New Yorke,” in 1695, limits the populated territory on the north, to what is now Wall street, where there was a wall at that day. The King’s Farm, is laid down as extending north from a boundary line drawn near where Dey street is now situated; and the tract where Trinity Church now stands, is designated as the “ ground proper for building an English Church.” A copy of this map is to be found in the excellent Manual prepared by Mr. Valentine, clerk of the Common Council, for the years 1845-6.
Next, is a “ Plan of the city of New York, from an actual survey made by James Lyne,” dated 1728, a copy of which is published in Mr. Valentine’s Manual for 1842-3, and also in Dunlap’s History of New York. The most northwardly street laid down on this map, west of Broadway, is Windmill lane, about midway between the present Cortland and Liberty streets, (though lines are drawn, as if for a street where Cortland street now runs ;) and the “ King’s Farm ” is laid down as extending along the North river, an undefined distance from a point a *746 little below the present Fulton street, northwardly beyond the present Park, which was then a common. Broadway terminated at the lower end of the common, from whence the “ High Road to Boston ” set out, passing up what is now Park Row and Chatham street. The common extended to the “ Fresh Water,” which is mentioned in the grants to John Evans and Anthony Rutgers.
The map of the city of New York, made by Francis Maerschalck, city surveyor, which to this day is frequently referred to in conveyances of lands, in what is now the extreme lower part tif the city, was published in 1755. Upon this map, the King’s Farm is laid down as extending from Partition street, (now Fulton,) northerly along Hudson’s river; and from Partition to Warren street it is marked as being laid out in blocks, with intersecting Streets, and at great intervals scattering tenements are designated on this portion of the farm. It may be well to mention here, that the Palisades, built in the French war, (frequently called the Stockadoes in the leases, &c.¡) are laid down on this map as extending in a succession of lines, making obtuse angles with each other, with block-houses at the angles, from St. James’s street, East river, across the common,, (now the Park,) to the North river, about one hundred and ten feet north of Warren street, crossing what is now Broadway about the same distance above Warren street, and keeping that average distance to the river.
The History of the Province of New York, by William Smith, is a work of great authenticity; and from the circumstance that its author was an eminent lawyer, born and residing in the province, and as an ardent Presbyterian, entering zealously into the controversies of his day, especially the one relative to King’s, (now Columbia) College, in which Trinity Church was very conspicuous; it can not be suspected of any partiality toward that church, or of any disposition to favor its character or pretensions. The first volume of this history was published in 1756-7, bringing the narrative of events down to the year 1736 ; and the appendix contains an account of the state and condition of the colony, at the time of its publication. In his description of the 11 City and County of New York,” the *747 author describes the line of palisadoes, as laid down on Maer? schalck’s map; and in reference to the corporation of Trinity Church, he says, “ The revenue of this Church is restricted by an act of Assembly to £500 per annum; but it is possessed of a real estate at the north end of the town, which, having been lately divided into lots and let to farm, will in a few years produce a much greater income.”
In the second volume of Judge Smith’s history, published by his son after his death, the author, in giving his account of the political and sectarian struggles preceding the chartering of King’s College, says that, “so early as the 8th of April, 1752, the wardens and vestry of Trinity Church, by Mr. Barclay, their rector, offered a part of the estate of their opulent corporation, in the suburbs of the capital, for the erection and convenience of the college.” Concurrently with this, we have in evidence the munificent grant made by Trinity Church to King’s College, being a deed in fee to the college corporation, dated. May 13, 1755, and conveying all that part of the King’s Farm, lying between Barclay and Murray streets, and extending from Church street to the North river.
After the lapse of nearly a century, no higher evidence of possession and claim of title can be imagined, than this, furnished from the pen of a learned and eminent historian, who, during his whole life, was unfriendly to the institution whose title he commemorates; and who, on at least one occasion, as will be mentioned in another place, was employed in his pro? fessional capacity against Trinity Church, in respect of this identical property.
Next, in the order of time, is a “ Plan of the City of New York,” by Bernard Ratzen, a lieutenant in the British army, made from a survey in 1767. On this map, Warren street is the farthest street up Broadway which has a name; but the present Chambers and Reade streets, and one block of the present Duane street, are marked out; and Church and Chapel streets are laid down, the former nearly as far north as what is now Thomas street, and Chapel street stopping south of the point where Duane street now intersects it. The “Road to Greenwich” is also laid down, running along and near the mar *748 gin of the river, beyond where Mr. Lispenard’s house and garden are designated; and certain tenements are laid down as “Mr. Harison’s,” west of the road to Greenwich, just above where Duane street now intersects Greenwich street. Adjoining Greenwich road, between Warren and what is now Chambers street, another garden is portrayed on the map, which corresponds in position with the place designated on Lyne’s map, in 1728, as the “ Bowling Green Garden.” The King’s or Church’s Farm, is not mentioned on Ratzen’s map, but the localities to which I have alluded, are prominent points in the documentary evidence of the possession of the church.
Second. Tne record and documentary evidence of the possession and exclusive ownership of Trinity Church, from 1705 to 1831.
The lease of the whole farm to George or Joris Ryerse already mentioned, extended to the year 1709. The depositions of Kooning and Layton, taken in 1751, already noticed, declare that Ryer Ryerse succeeded Joris Ryerse in the possession of the King’s Farm, under the church; Francis Ryerse succeeded to Ryer Ryerse; and he was succeeded by one Harrison, and the latter by one Balm, who was succeeded by Cornelius Cozine. That Cozine had it for some years, and then Adam Yandenburgh took it, and he was in possession in 1751. And that all of these persons, as the declarants often heard, and always understood, held as tenants of the English Church.
Original counterparts of leases were introduced by the defendants, extending through this period as follows: From the corporation of Trinity Church to Robert Harrison, dated July 20, 1721, for ten years, for the King’s Farm, reciting that it was lately demised to Francis Ryerse, excepting six acres leased to W. Lake, and the lots laid out and staked at the south end of the farm. A lease from the same corporation to Cornelius Co-zine, May 1, 1732, for a term of ten years, in which the land is designated as the Church Farm.
A record of conviction, and an original writ of restitution in the supreme court, were read in evidence, by which it appeared that in 1746, and indictment for forcible entry and detainer, was *749 found against Jacob Brower and others for the Church Farm, described as being the freehold of Trinity Church, in the possession of Adam Yandenburgh ; on the trial of which, Brower and others were convicted, and restitution was ordered to reseise the church, and put Yandenburgh in possession.
In 1750, the church commenced leasing the southern part of the farm in single city lots, and thus demised some thirty three lots during that year, including several which were on that part of the farm claimed as the Dominie’s Bowery. Most of these lots were let for twenty-one years. The number of these leases of city lots, increased with great rapidity from 1750 to the Revolution, so that, at the latter era, almost every foot of the Church Farm lying south of what is now Reade street, (except the part conveyed to Columbia College,) was under lease for various terms, from Trinity Church, sometimes for sixty-three years, but generally for terms of twenty-one years.
I will refer to two or three of the principal leases, as exhibiting most conclusively, the entire and exclusive possession and control of the corporation over the King’s Farm, in different parts of the so called Dominie’s Bowery, nearly one hundred years ago.
In 1764 and 1768, respectively, the church granted two leases to Leonard Lispenard, one of eight acres, and the other of over nine acres, of the part of the farm called the Dominie’s Bowery; the one for a term of nearly one hundred years, and the other for more than thirty years. These tracts are situated northwardly and eastwardly of what is now known as Hudson or St. John’s Square, and the former is designated as “Mr. Lispenard’s,” on Ratzen’s map, made in 1767. It was proved by living witnesses, that both of these tracts had been held under these demises continuously, and the eight acres down to the present time.
Elias Degrushe, on the 28th of February, 1750, obtained a lease from the church of the three lots at the northwest corner of Warren street and Broadway, for twenty-one years. The northerly lot extended west from Broadway twelve hundred feet, almost to the bank of the river. The description in this lease, shows that the farm above the long lot was not laid out in buill *750 ing lots; and as that below was so laid out, it follows that the part of the King’s Farm leased as a farm to Vandenburgh, was wholly upon the Dominie’s Bowery.
The possession of Degrushe, is established by Maerschalk’s map, on which his rope-walk is laid down as occupying the demised premises.
The lease to Burnham, of five acres at the northwest part of the King’s Farm, was also given in 1750, as is noticed hereafter.
On the first of February, 1759, a lease for twenty-one years, was made to one Marshall for four fifths of an acre, called the old Bowling Green, being the same parcel which is laid down on Dyne’s map, of 1728, and Ratzen’s in 1767.
On the 25th March, 1769, these premises were included in a lease of a larger tract for three successive terms of twenty-one years each, to Samuel Francis. This lease was surrendered to the corporation in 1789, and a large part of the premises conveyed in fee the same year.
A lease was granted to George Harison, on the 24th of October, 1765. of a tract containing twenty-four lots between Greenwich street and the river, and situated between two streets which afterwards received the names of Harison and Jay streets, for a term of ninety-nine years. This tract is shown by Ratzen’s map to have been occupied by Mr. Harison, in 1767.
On the 5th of May, 1768, the church demised a parcel of more than two and a half acres to John Keating, for sixty-three years, extending from Provost (Franklin) to Moore (North Moore) street, and from Greenwich street eastwardly to Rutgers land, On this parcel, some of the demonstrations were made by persons asserting the Bogardus title, in or about 1785, which resulted in an expulsion by an indictment for forcible entry and detainer, as hereafter mentioned ; and all the demised premises were north of the south bounds of the Dominie’s Bowery.
To return to the Church Farm generally. A lease executed by Adam Vandenburgh was proved, by which he demised of the church, on the 5th of March, 1752, for five years, the whole *751 farm north of the Stockadoes, excepting the four acres at the northwest part of the farm, adjoining Sir Peter Warren’s land, which had been leased by the church, February 28th, 1750, to William Burnham, as before mentioned. The lease of Yandenburgh contains intrinsic evidence that the land was used and cultivated as a farm ; and all the demised premises were north of the south bounds of the Dominie’s Bowery.
On the 17th of March, 1758, the corporation demised the Church Farm, (described as containing seventy-seven acres, excepting about three acres and an eighth adjoining the palisadoes,) to Cornelia Rutgets and Leonard Lispenard for twenty-one years. This lease was surrendered by Lispenard, as survivor, on receiving the long lease of eight acres in 1764.
It was proved that, in 1749, an ejectment was commenced by Cornelius Brower against the corporation of Trinity Church, for the recovery of a farm of sixty-three acres, described as in the possession and tenure of Adam Yandenburgh, and which is identified as the farm in question. The plaintiff’s attorney was the historian, William Smith, Esq.; and the suit, after being at issue two years, resulted in a judgment as in case of a nonsuit. This record furnishes evidence of the possession of the farm by Yandenburgh, as tenant of the church.
Another suit in ejectment for the same premises, described as in the possession of Cornelius Yandenburgh, was commenced by Judge Smith, in favor of Brower, against the corporation, in the year 1757. The suit was tried in October, 1760, and a verdict found for the defendants. This is the same suit in which the lease to Dirck Seekers was produced, as heretofore mentioned.
The defendants proved their actual possession of the church Farm, claiming it as their own, from 1768 or 1770, to the present time, by living witnesses, among whom were Morgan Lewis, formerly governor of the state, Peter Lorillard, and Peter Embury.
The number of city lots leased by the corporation, down to the year 1764, on that part of the farm in which the complainants locate the Dominie’s Bowery, was from one hundred and forty to one hundred and fifty, dispersed in every direc *752 tion between Warren street and Rutger’s land. After 1764, the leases multiplied very rapidly, and more than three hundred and fifty, executed prior to this suit, were read in evidence; generally for twenty-one years, and most of them for several lots. Nearly two hundred leases of a later date were proved. And evidence of the demise of more than a thousand city lots was thus exhibited, which, with the large tracts leased for long terms of years, yet unexpired, embraced apparently, every foot of the Dominie’s Bowery.
The possession of the church, and their claim of ownership in fee, exclusive of any other right, from 1786 to this day, was so fully proved by oral testimony, as well as historical and documentary evidence, that no question was raised upon it at the hearing. It is sufficient to say on this head, therefore, that the defendants read in evidence several hundred conveyances in fee, executed by their corporation, from 1784 to the hearing, transferring four hundred and eighty lots, of which deeds three hundred and six were executed before the commencement of this suit, and all the lots thereby conveyed were within the Dominie’s Bowery.
The demises and eonveyances introduced, also proved that the corporation had, from the earliest period, always treated that part of their farm which included the Dominie’s Bowery, in precisely the same manner that they did the portion of their farm lying south of the Bowery, to which portion their title has never been questioned.
No difference is perceptible in their leases or conveyances of the one or the other, and there is no appearance of their ever having known any dividing line, or any distinction between them.
There is, therefore, on the part of the defendants, an unbroken current of evidence of the highest character, proving their 1 possession of the Church Farm, claiming it as their own, from 1705 to 1846. There can be no stronger testimony of ownership in fee, than is exhibited in the records, leases, and conveyances, produced on this occasion. The extent of the proof and its immense force would be marvelous, in the case of a title owned by an individual. Nothing but the conservative nature *753 of the continued existence of a corporation aggregate, could have enabled the defendants to em body such a mass of testimony, extending through nearly five generations of men.
But it is contended with great earnestness that the chain of the defendants long possession was disturbed and broken in 1784-5 ; and that the breach destroys the force of their plea.
Without entering upon a minute detail of the testimony relative to the occupancy of Cornelius Bogardus, in 1784, and the year or two following, it will suffice to state the result in brief terms. The lot upon which he lived, was before the revolution, possessed under a lease from the church for twenty-one years, which expired in 1782, and the occupant died about the time of the peace. This lot was taken by the city to enlarge Chambers street, before 1799. John, the son of Cornelius, is shown to have lived on some of the lots, in 1784 and 1785. In the first instance, he was on a lot leased by the church in 1761, for twenty-onfe years, and then, in 1782, for fourteen years, to Christopher Smith, and which, in 1788, the church conveyed in fee to W. Alexander, His next move was into a house vacated just before by an under-tenant of the church, the lease not having expired, and from which John Bogardus was turned out by the church, in 1786, and the lot by them conveyed to James Ryker in fee, in 1789.
After this, John Bogardus lived on two or three different lots for short periods, all of which had been previously rented by the church for various terms ; and as his father left the city in 1786, and there is no pretence that he held under his father after that time, it is needless to trace his migrations.
The testimony as to the gravel pit is unimportant, for it is clear that it was not on the Church Farm or the Dominie’s Bowery.
As to the persons put in possession by Cornelius Bogardus, after the peace of 1783, they are five or six in number, and their possessions appear to have been in what was then a mere suburb of the city, at and about Chambers street; and, so far as the locations were designated, it is shown that a part of the lots thus taken were, or had been, under leases from the church, in which the tenure continued, and all are shown to have been, very *754 soon after, in their undisputed possession. A possession-house and fence were erected by one of the Bogarduses, toward what is now Hudson Square, which, it appears, brought matters to a crisis ; some violence ensued, and the possessor was put out by summary legal process.
The defendants produced from the files of the supreme court the record of a conviction on the 27th June, 1786, in a forcible entry and detainer, prosecuted by John Keating against Cornelius Bogardus, tried before the chief justice. The premises were in the west ward, and evidently a part of those demised to Keating in 1768. From the same files were produced two records of judgments in trespass on lands, in favor of Keating, one against Bogardus, and the other against Malcolm; the latter, after a trial before the chief justice, on which the jury gave £90 damages, and the other on a confession after issue joined, given after Malcolm’s trial. These records undoubtedly contain the judgment of the law, on the attempts of Bogardus to intrude into the possession of the Church Farm.
This was in 1786, and with it apparently terminated all possession, or color of possession, of any part of the premises, by the complainants ancestors.
The whole subject of this possession, is in a legal view, quite insignificant, and it effected no change in the rights of the parties. On the one side, was this corporation, having for eighty years been in the sole possession of the farm by their tenants, and thereby, if not by the Queen’s grant, having acquired a perfect title against all the world. The advance of the city, had converted the extreme south part of the Dothinie’s Bowery, into city lots. The part thus laid out, was doubtless, as in the suburbs of our growing cities of the present day, in part actually occupied by tenants, and a greater part lying waste in uninclosed commons. The possession of the latter, it is hardly necessary to say, continued in 'the church, as much as that of the lots actually inhabited. The war, and the long occupation of the city by an army hostile to a great part of the citizens, unquestionably aggravated the waste and destroyed the inclosures of the Church Farm. When the city was eva'cuated in the fall of 1783, and the state government resumed its sway, Cornelius Bogardus, *755 probably believing he had some claim to this farm, availed himself of the confusion, and the relaxation of civil authority consequent upon the change of government, to effect a lodgment upon the debatable portion of the farm, which was at the moment neither city nor country. In the multitude of their leases, and still more in the uncertain position in which the Church of England parishes were placed by the new order of things, this lodgment was, in its humble and unobtrusive way, of two or three years duration. And it is possible that the popular enmity then entertained against the church, as a seeming branch and portion of the expelled regal prerogative, weakened the arm of justice, and for a time deterred the corporation from invoking its aid.
However this may be, the possession of Cornelius Bogardus, was not such an entry as to disturb or turn the current of the legal possession of the church. His individual entry was that of an intruder, and the entries of John were clearly as a tenant under the church. A landlord does not lose his possession, by a tenant’s yielding the same to an adverse claimant. And the result of the attempt, terminating in their dispossession, without an effort for more than forty years, to recover the land, is conclusive to show that the entry was a trespass, and not a legal or rightful entry upon lands. The rule of law, as established for two hundred years, is, that an entry shall not be deemed sufficient or valid as a claim, unless an action be commenced thereon within one year after the making of such entry, and within twenty years from the time when the right to make such entry descended or accrued. This rule is a part of our revised statutes. (2 R. S. 293, § 7.)
It is also the law, and has been made a part of our statutes, that the occupation of lands shall be deemed to have been under, and in subordination to the legal title, unless an adverse possession of twenty years is shown.
In,this instance there was a legal title, and over a century’s possession, in the corporation of Trinity Church and its grantors ; and except the proof be distinct, that the Bogarduses did not enter into the lands held by the tenants of the church, and *756 that they did hold adversely for twenty years, their entry must be deemed to have been under the title of the church.
No such adverse holding is claimed for them, and their entry was clearly unavailing in respect of the title.
But, further, the claim now is, that Cornelius Bogardus entered as a tenant in common only. So far from any such inference being deducible from the complainants testimony, it shows an entry in severalty, claiming it for himself and the other heirs of Anneke Jans.
Indeed, the whole testimony on this point, as introduced, showing, if any thing, a hostile entry and claim, excluding any right of the church, is directly in the face of the complainants bill, which asserts throughout, that the defendants have been in possession, without interruption, from 1705 to the time it was filed, and makes no issue whatever upon that fact. The only approach to such a point in the bill, is the equivocal expression applied to the last Cornelius Bogardus, 11 taking certain of the esplees and profits,” which relates to another and negative allegation in the plea, which is yet to be considered.
The negative averments in the third subdivision of the plea are, first, that the defendants have never paid or accounted to the complainants or their ancestors, for any rents or profits, and have never admitted that they were bound to do so, either in law or equity. Second. That the defendants never held or possessed the lands in question, or the rents and profits, in common or undivided with, or as trustee of, the complainants or their ancestors, and have never admitted that the latter had any estate, share, or interest in the lands, or the rents and profits thereof.
From the nature of these allegations, the principal burden of proof is upon the complainants. (2 Daniell’s Ch. Prac. 224,225, 1st ed.) They assert; the defendants deny the charge. The matters, if they exist, are peculiarly within the knowledge of the complainants. They are positive facts. All the defendants are bound to do, is to raise a presumption from their acts in respect of the property, its use, and disposal, that no such facts exist; and the presumption must prevail, unless met and *757 overcome by proof on the other side. (See 1 Greenleaf’s Ev. § 74.)
For the whole period to which the memory of aged men extended, the defendants did prove distinctly, these negative allegations. From 1784 to this day, there has been no such payment, accounting, admission of right, or holding in common. As to the period anterior to living memory, they raise a violent presumption to the same effect, by their leases, reserving the whole rents and profits to themselves, and demising the whole premises.
On the other hand, there is not a scintilla of evidence in favor of the complainants, on either of these propositions.
The charge in the bill, as to “ taking certain of the esplees and profits,” is traversed by the plea. The proof as to the occupation and receipt of rents by Cornelius Bogardus, in 1784-5, as I have already observed, was that of a hostile and tortious entry upon the possession of an owner holding in fee, and not the entry of a tenant in common. The defendants title was absolute in 1784, even if dueen Anne had no title when her grant was made, (Clapp v. Bromagham, 9 Cowen, 530, before cited ;) and if Cornelius Bogardus then took any (1 esplees,” he was a trespasser.
An objection to the title and claim of the church, was made on the ground, that by the act of June 27, 1704, confirming the charter of the church, its clear income from lands was restricted to £500 a year, and the income from the church farm before the revolution exceeded that limit. This was urged, both as an obstacle to the corporation’s holding adversely, lands producing an excess over their legal income, and as showing that the surplus beyond £500, was an accumulated fund in the hands of the church, which they had no right to retain, and which, as trustees, they are bound to account for to the complainants.
On the other hand, the defendants say the act of 1704 was repealed by the legislature, by the law relative to the church, passed April 17th, 1784. (1 Jones and Yarick’s Laws, 128.)
The act of 1704 is undoubtedly repealed in express terms by *758 the act of 1784. Whether the last section of the latter still leaves the church subject to any of the restrictions imposed by the former, it is unnecessary to decide ; for there are two short and conclusive answers to the objection, without reference to the repeal of the limitation. First, the church acquired the title to the King’s Farm, by the letters patent in 1705, when the whole farm was not worth as much as one city lot of twenty-five by a hundred feet, in almost any part of it, would sell for at this moment. Nor is it probable that the, most visionary speculator of that era, expected to live to see the day when the King’s Farm would yield a net income of £500 a year. In 1704, the church leased the farm for five years at £30 & year. It is undeniable, therefore, that the grant by Queen Anne, was clearly within one tenth part of the limitation imposed by the act of 1704.
Now it scarcely needs an observation to show, that the accidental increase in the income of a corporation derived from its vested estates, to a point beyond what its charter prescribes, cannot have the effect to divest its title in such estates, or in any portion of them. The excess of income in such a case, would not belong to the grantor of the property, much less to one claiming adversely both to the grantor and to the corporation.
Secondly, if when the church acquired the title, whether it were in 1705, or at the end of sixty years from their entry under the grant, the income were in fact more than £500, no private persons could take advantage of the fact. It is a question between the corporation and the sovereign power, in which individuals have no concern, and of which they cannot avail themselves in any mode against the corporation. This was so decided in regard to this church, in Humbert v. Trinity Church, in the highest court in this state, (24 Wend. 587, 604, 629); and the same objection was made and overruled in the case of Harpending v. The Dutch Church, (16 Peters, 492-3.) And see Vernon Society v. Hills, (6 Cowen, 23.) The same point was decided in the supreme court of Pennsylvania, in Baird v. The Bank of Washingtsn, (11 Serg. and Rawle, 418); and *759 by the court of appeals of Virginia, in The Banks v. Poitiaux, (3 Randolph's R., 136.)
The notion of a trust for the complainants, as to the supposed excess of rents beyond the corporate capacity of the church, is founded on the assumption that the complainants have made out that the church has all the while been holding the farm as a tenant in common with them. If they have succeeded in establishing the latter proposition, they need no aid from the limitation of the income of the church. Their right to relief would rest upon much higher ground. If they have failed to show the holding in common, their assumption of a trust as to the excess, is left without any foundation for its support.
The result of my investigation is, that the defendants plea is fully sustained in all its parts and propositions ; and as the law of the cause has been decided in our court of last resort, it is an entire and effectual bar to the complainants suit, and their bill must be dismissed.
Before leaving the case, I will recur to one other view which was discussed on the argument. If it had been proved that Cornelius Bogardus entered lawfully and in his own right as tenant in common in 1784, and continued his possession, as is claimed by the complainants, they could not maintain their claim to the lands in question.
I have already referred to the law on this subject, (and it was the law before the King’s Farm was cultivated by Europeans,) which renders such an entry unavailing for any purpose, unless it be followed up by a suit for the recovery of the land, within the prescribed period limiting such actions. But, independent of that rule of law, the complainants are doubly barred from any relief founded upon the entry of their ancestors in 1784 : First, because the church, irrespective of actual title ; by their possession of the farm for seventy-eight years, claiming it as their own in fee-simple, exclusive of any other right, under a grant in writing ; had acquired a valid title to the farm against all the world. It would be a waste of time to cite any of the very numerous authorities which sustain this proposition. *760 Against such a title, the entry of Cornelius Bogardus, was of no more consequence than would have been the entry of an entire stranger to the blood of Armeke Jans. If he had succeeded in retaining his foothold, so as to have driven the church to an ejectment, they would have recovered against him inevitably, on proof of the letters patent, and their long possession and claim under the same. (Smith v. Lorillard, 10 John. 338, 339.)
Secondly. Leaving wholly out of view the possession prior to 1786 ; from that time to the commencement of this suit, which was forty-four years, the church have undeniably been in the actual visible possession of the premises, claiming the whole in fee, under the latters patent, exclusive of any other rigjrt, and in direct hostility to the complainants claim. This is another full and perfect bar to that claim.
In answer to these points, it is said that they do not support the plea, which relies on an unbroken possession from 1705 to 1830.
It is to be borne in mind, that the plea was adjudged to be valid in law, by the court for the correction of errors, not because it set up an adverse possession of one hundred and twenty-five years, but because the corporation had maintained such possession for a period long enough to bar a writ of right. (See the report of the plea, Bogardus v. Trinity Church, 4 Paige, 178) and 15 Wend. 111.) This limitation, in 1705, was sixty years. In 1788, it was reduced to twenty-five years.
The defendants, in support of their plea, are bound to prove only its substance, and to such au extent as will maintain the bar which it interposes to the suit. To illustrate this proposition, I will suppose a bill filed at this time, relative to a trust created in 1830, to which the trustee pleads, that for fifteen years last past, he has done no act, nor admitted any thing in respect of the alleged trust, and that the complainant is barred by lapse of time, by the provisions of the revised statutes. The limitation to such suits by those statutes, is ten years; and if, on an issue taken upon such a plea, it should appear that for ten years before the suit, there had been no act or recognition respecting the alleged trust, I apprehend that the plea would be sustained beyond a doubt.
*761 So, in this case, if the defendants have shown that such a state of facts relative to this farm, as is set up in the plea, con- j{ tinned for more than sixty years before the year 1784, and that . it continued, also, for more than forty years immediately prior to | 1830, it is clear in my judgmnet, that they have sustained the j substance of their defence, and have doubly sustained it. j
In concluding, justice to the defendants requires me to state, that the delay which has occurred since the argument of the cause before me as assistant vice-chancellor, has not been owing in the slightest degree, to any difficulty which it presented to my mind. When the argument was closed, it was made known that there was a defect of parties, arising from the death of some of the claimants. The cause necessarily stood over, to have the proper parties brought into the suit. Immediately on its being revived, the complainants counsel applied to have the decision suspended, until they could move the court for leave to introduce further testimony. When this motion was disposed of, I had ceased to be the assistant vice-chancellor, and there was no opportunity to submit the cause to me as vice-chancellor, until the close, of the last January term. A long illness immediately succeeding, and an unexampled pressure of business in the court ever since, have delayed my investigation of the cause, until the last month of my official term.
And now that I have been enabled to examine it carefully, and with due reflection, I feel bound to say, that a plainer case has never been presented to me as a judge. Were it not for the uncommon magnitude of the claim, the apparent sincerity and zeal of the counsel who supported it, and the fact, (of which I have been oftentimes admonished, by personal applications on their behalf,) that the descendants of Anneke Jans, at this day, are hundreds, if not thousands, in number; I should not have deemed it necessary to deliver a written judgment on deciding the cause.
A hearty dislike to clothing any eleemosynary institution with either great power or extensive patronage, and a settled conviction that the possession by a single religious corporation, of such overgrown estates as the one in controversy, and the anal *762 ogous instance of the Collegiate Dutch Church, is pernicious to the cause of Christianity ; have disposed me to give an earnest scrutiny to the defence in this case; as, in the instance of the Dutch Church, they prompted me, in my capacity of counsel, to more zealous efforts to overthrow their title to the lands devised by Jan Haberdinck. .But the law on these claims is well settled; and it must be sustained, in favor of religious corporations as well as private individuals. Indeed, it would be monstrous, if, after a possession such as has been proved in this case, for a period of nearly a century and a half, open, notorious, and within sight of the temple of justice ;■ the successive claimants, save one, being men of full age, and the courts open to them all the time, (except for seven years of war and revolution ;) the title to lands were to be litigated successfully, upon a claim which has been suspended for five generations. Few titles in this country would be secure under such an administration of the law; and its adoption would lead to scenes of fraud, corruption, foul injustice, and legal rapine, far worse in their consequences upon the peace, good order, and happiness of society, than external war or domestic insurrection.
The bill must be dismissed, with costs.